**Opinion concurring in the judgment issued December 31, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00867-CV

_____

### IVAN VILLARREAL, Appellant

### V.

### TEXAS SOUTHERN UNIVERSITY; DANNYE HOLLEY, IN HIS INDIVIDUAL & OFFICIAL CAPACITIES; EDWARD MALDONADO (A/K/A SPEARIT), IN HIS INDIVIDUAL & OFFICIAL CAPACITIES; GABRIEL AITSEBAOMO, IN HIS INDIVIDUAL & OFFICIAL CAPACITIES, Appellees

---

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2016-64945

---

### CONCURRING OPINION

The Texas Bill of Rights provides that no "citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner

disfranchised, except by the due course of the law of the land."[1] As this provision was understood when our Texan predecessors adopted the 1876 state constitution, a law student's dismissal from school for poor academic performance properly should not be considered a deprivation of liberty. Even if it were, in the circumstances of this case the dismissal was not inconsistent with "the due course of the law of the land."

I concur in the judgment as an intermediate appellate court's application of controlling precedent. But I also respectfully suggest that in their past development of Texas constitutional law, Texas courts often have too uncritically adopted the federal courts' ever-morphing methods of applying the Fourteenth Amendment of the U.S. Constitution. The Texas bench and bar should undertake the effort of litigating and implementing the proper interpretation of our unique Texas Constitution. Not for the sake of being different, but because our state constitution serves an important function as a distinct source of legal protections for individual rights, because reasonable jurists can and do disagree about how the legal concept of due process can and should be implemented by courts, and because independent reasoning by Texas judges could positively influence the development of the law in other states and in the federal courts as well.

---

[1] TEX. CONST., art. I, § 19.

# I

Ivan Villareal's fundamental complaint is that he was dismissed from a public law school. The justification was that his GPA fell below 2.0, which mandated his dismissal under school policies. Villareal does not challenge the constitutionality of the policy of requiring a 2.0 GPA to continue his studies.

There is no allegation that the law school failed to provide fundamental procedural protections to Villareal in the implementation of this policy. The school provided Villareal notice of his dismissal and the reason for it. He had opportunities to give reasons why the policy should not be applied to him, and he actually was heard in various ways by the Academic Standards Committee and in personal meetings with two deans. To the extent Villareal attributes his substandard GPA to one particular grade, he also had an opportunity to challenge that grade after the fall semester, though he failed to do so. Thus from a procedural perspective concerning the individual grades that cumulatively determined his GPA and resulted in his academic dismissal, Villareal has no constitutional grievance whatsoever.

But there's more to this case, which confounds the typically observed distinction of dismissals based on academic performance from those based on

student misconduct.[2] Villareal's 1.98 GPA was so close to the 2.0 cutoff that the smallest incremental increase of any one of his grades would have allowed him to stay in school. And there were unusual circumstances surrounding one of his classes, his fall course in criminal law. The first irregularity arose from a law professor previewing actual questions from a criminal-law exam given to the entire first-year class and graded on a curve. Villareal alleges that an unfair advantage to some students depressed the grades of other students and caused his own GPA to dip to 1.98.

The exam irregularity allegedly was compounded by the school administration's handling of the matter. Villareal criticizes the investigation for jumping to unwarranted conclusions by failing to fully inquire about the scope of the problem, such as how many questions were previewed and how many students were disadvantaged as a result. The school then reported to students selected excerpts of the resulting statistical analysis as an apparent assurance that grades were unaffected. Villareal contends that he relied on this information when he decided not to challenge his criminal-law grade, a decision he regretted the next semester when an incremental grade adjustment could have made the difference that allowed him to continue his studies. The subject of the constitutional challenge

---

[2] *See, e.g.*, *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 931 (Tex. 1995) (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86–87, 98 S. Ct. 948, 953–54 (1978)).

therefore is not simply his dismissal for low grades, but the cumulative effect of conduct by school employees that impacted one component of one grade just enough to subject Villareal to an otherwise unimpeachable academic dismissal.

Villareal sued, seeking a declaration of his rights and injunctive relief in the form of re-admittance to the law school as a second-year student in good standing. He alleged that a contract with the law school was breached, but his claims are primarily based on the Texas Constitution's due-course-of-law protections. For reasons that are not disclosed in the appellate record, Villareal has deliberately confined his constitutional claims to the Texas Constitution, and he has expressly disavowed reliance on comparable federal protections.[3]

## II

To reach the conclusion that Villareal's complaint presents a valid type of constitutional claim, courts have identified reputation associated with the pursuit of

---

[3] The procedural posture of this appeal and the presentation of state constitutional issues are therefore quite different from the circumstances of *Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992), in which only federal constitutional arguments were made until the Supreme Court of Texas invited supplemental briefing on the effect of the state constitution. *See also* Jeffrey S. Sutton, 51 IMPERFECT SOLUTIONS: STATES AND THE MAKING OF AMERICAN CONSTITUTIONAL LAW 8–9 (2018) (observing that although American dual federalism results in dual constitutional opportunities to challenge actions by state governments, most lawyers focus their arguments on federal claims and neglect to present meaningful distinct arguments based on state constitutions).

graduate education as a constitutionally protected liberty interest.[4] But it has been

persuasively argued that the "liberty" referenced in federal and state constitutional

due-process protections, which are similarly traceable to Magna Carta,[5] refers to

[4]    *E.g.*, *Than*, 901 S.W.2d at 930 (medical student expelled for academic dishonesty had "a constitutionally protected liberty interest in his graduate education that must be afforded procedural due process," citing *Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S. Ct. 729, 736–37 (1975), *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 572, 92 S. Ct. 2701, 2706–07 (1972), and *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961)).

[5]    Magna Carta, ch. 39 (1215) ("No free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land."); Magna Carta (1225) ("No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers or by the law of the land."); *see also Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (Scalia, J., plurality op.) ("The Due Process Clause has its origin in Magna Carta."); *Den v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276 (1855); *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 82–84 (Tex. 2015) (discussing history of adoption of due-course-of-law clause, including alterations made at the 1875 constitutional convention); *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983) (acknowledging that article I, section 19 of the Texas Bill of Rights has its origin in Magna Carta); 1 George D. Braden et al., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 68 (1977) ("Whether the phrase be 'due course of law' or 'due process of law' they both have a common origin in the 'law of the land' expression of the Magna Carta and a common history."); John Cornyn, *The Roots of the Texas Constitution: Settlement to Statehood*, 26 TEX. TECH L. REV. 1089, 1127–30 & n. 245 (1995) (noting that due course of law was incorporated in the 1845 Texas Constitution "without debate" and later reproduced in the 1876 Texas Constitution); J.E. Ericson, *Origins of the Texas Bill of Rights*, 62 S.W. HIST. Q. 457, 463–64 (1959) (noting that the "due course of law" provision was first introduced in a Texas constitution upon statehood in 1845).

freedom from physical restraint: "the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law."[6] This conception of liberty also was understood as a freedom from governmental interference, not a right to governmental entitlements.[7]

Even to the extent courts have stretched the concept of liberty for these purposes beyond the original public understanding at the time the Texas Constitution was adopted, the case for treating a citizen's pursuit of graduate education—and whatever embarrassment may accompany an expulsion from school—as sufficiently fundamental to invoke constitutional protection under the rubric of due process is far from self-evident. Contemporary precedents have identified a student's reputational concern for not being arbitrarily dismissed on grounds of alleged misconduct as the justification for recognizing a liberty interest

---

[6]    1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 130 (1769); *see also* Charles Warren, *The New "Liberty" Under the Fourteenth Amendment*, 39 HARV. L. REV. 431, 441–45 (1926) (discussing the founding-era interpretation and application of "liberty" as used in state constitutions).

[7]    *See* Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 YALE L.J. 907, 918–19 (1993) (arguing that Americans in the founding era understood natural liberty as "the freedom an individual could enjoy as a human in the absence of government").

worthy of constitutional protection.[8] Without diminishing the significance of the

concern for students facing that circumstance, it bears observation that the cases

have not attempted to justify extending constitutional protections on the grounds

---

[8]  *See Goss*, 419 U.S. at 574–75, 95 S. Ct. at 736 (high-school students were suspended for up to 10 days on charges of misconduct that, "[i]f sustained and recorded . . . could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment"); *Than*, 901 S.W.2d at 930 ("A medical student charged with academic dishonesty faces not only serious damage to his reputation but also the loss of his chosen profession as a physician. . . . The stigma is likely to follow the student and preclude him from completing his education at other institutions.").

The liberty rationale in *Goss* was arguably dicta, as it was secondary reasoning provided after the Court first referenced Ohio state law to determine that public high-school students in that state had "legitimate claims of entitlement to a public education." 419 U.S. at 573, 95 S. Ct. at 735 (citing OHIO REV. CODE §§ 3313.48 and 3313.64 (1972 & Supp. 1973)). The Court held that a 10-day suspension was a sufficiently significant intrusion on the students' state-law property right to attend school, *id.* at 576, 95 S. Ct. at 737, and that the Due Process Clause required that a student receive "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S. Ct. at 740. Later U.S. Supreme Court cases reviewing student dismissals have focused on the adequacy of process without confronting questions of whether a protected liberty or property interest had been implicated. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222–23, 106 S. Ct. 507, 511–12 (1985); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. at 84–85, 98 S. Ct. at 952.

that this interest is of a nature "so rooted in the traditions and conscience of our people as to be ranked as fundamental."[9]

### III

Even accepting precedents such as *Goss v. Lopez*[10] and *University of Texas Medical School at Houston v. Than*[11] at face value, their application to the unique

---

[9] *Snyder v. Mass.*, 291 U.S. 97, 105, 54 S. Ct. 330, 332 (1934) (Cardozo, J.); *see also Michael H. v. Gerald D.*, 491 U.S. 110, 122–23, 109 S. Ct. 2333, 2341–42 (1989) (Scalia, J., plurality op.). *Than* cited *Goss*, which quoted Justice Douglas's opinion in *Wis. v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507 (1971), for the proposition that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437, 91 S. Ct. at 510; *see Goss*, 419 U.S. at 574, 95 S. Ct. at 736; *Than*, 901 S.W.2d at 930. This language in the *Constantineau* opinion was not directly supported by legal authority, and the opinion included no analysis grounding the announced standard in legal history or tradition.

Notably, in *Constantineau* the plaintiff complained that, without notice or a hearing, a police chief caused a notice to be posted in all liquor stores in his town, stating that sales or gifts of liquors were forbidden to him for a year. 400 U.S. at 435, 91 S. Ct. at 509. This action was authorized by a state statute described by the court as providing "that designated persons may in writing forbid the sale or gift of intoxicating liquors to one who 'by excessive drinking' produces described conditions or exhibits specified traits, such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." *Id.* at 434, 91 S. Ct. at 508. Thus the nature of the reputational concern deemed to invoke constitutional protection as a liberty interest started with publication of a notice that branded a person as an excessive drinker and prevented him from buying liquor (*Constantineau*), then expanded to include a high-school student expelled for 10 days for misconduct (*Goss*) and a medical student dismissed for academy dishonesty (*Than*). Villareal would have us expand this concept to a law student dismissed for poor academic performance without any suggestion of wrongdoing by the student.

facts of this case should not compel a conclusion that a constitutional claim is viable. It's one thing for courts to have held that a state university or its employee can be sued when bad faith tainted a decision to expel a graduate student despite a pretense of procedural protections such as notice and a hearing.[12] But it is hard to see how that circumstance is implicated in this case, when the essential allegation is not a denial of procedural fairness in enforcing the rule imposing a minimum standard of academic performance.

Instead, Villareal presents a different kind of complaint that boils down to allegations of incompetence or self-serving malfeasance in the exercise of academic discretion, with an attenuated theory of causation that the marginal impact on the exam curve affecting 50% of his criminal-law grade had the consequential effect of pulling his GPA below the school's minimum standard for academic performance. But the suggestions that some conduct by Professor Maldonado,[13] or by Dean Holley and Dean Aitsebaomo,[14] could be proved to have

---

[10]    419 U.S. 565, 95 S. Ct. 729 (1975).

[11]    901 S.W.2d 926, 931 (Tex. 1995).

[12]    *See, e.g.*, *Alcorn v. Vaksman*, 877 S.W.2d 390, 397 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (en banc) (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 253 (8th Cir. 1985)).

[13]    Villareal's real complaint that Professor Maldonado gave an unfair advantage to some students is not based so much on the timing of the sessions as the preview of exam questions. Villareal did not allege that he

10

proximately caused Villareal's academic dismissal,[15] thereby depriving him of the opportunity to pursue a legal career, strain credulity.

## IV

Assuming that Villareal has a cognizable claim under the Texas Constitution, by what standard should a court evaluate it? In the past our court has applied an ultradeferential review standard found nowhere in the federal or state constitutions. If "reasonable academic judgment" was used to justify dismissal,

---

was not given substantively similar opportunities to attend other review sessions where he could receive supplemental instruction conducted by Professor Maldonado or others. Nor did Villareal identify statutes, regulations, or even informal policies governing the extent to which instructors were precluded from "teaching to the test" in review sessions or otherwise (classroom instruction, office hours, etc.).

[14] Read in the light most favorable to Villarreal, the petition suggests that administrators deployed junk science in an effort to assuage student concerns about the effect on the grade curve. There is no allegation of malice toward or discrimination against Villarreal or any identifiable group of students. The administrators could have consciously decided not to invest any greater effort into more rigorously evaluating the potential marginal effect Professor Maldando's review sessions had on an exam grade that was just one component of just one of many grades received by the first-year students. Maybe they wanted to shield Maldonado, themselves, and the institution from criticism. Maybe they just didn't know what to do and handled it poorly. In any case, Villarreal alleges no violation of a statute, regulation, or even informal policy in the handling of the matter.

[15] *Cf. Parratt v. Taylor*, 451 U.S. 527, 543, 101 S. Ct. 1908, 1917 (1981) (observing that although prisoner had been deprived of property under color of state law, "the deprivation did not occur as a result of some established state procedure").

then under our precedents the student's challenge can't succeed.[16] But once the courts have decided to recognize a constitutionally protected liberty interest in these circumstances, why would they then hold state-employed academics to such a toothless extraconstitutional standard determined by academia itself?

Courts applying due-process principles need not, and have no authority to, inject themselves into "every field of human activity where irrationality and oppression may theoretically occur."[17] It is unnecessary to constitutionalize disputes of this kind that can be better resolved in other ways that do not require courts to conjure rules to govern academic administration, especially if the rule they invent is only going to impose extreme deference to "reasonable academic judgment."

In the absence of legislative and regulatory guidance, the better tools for analyzing this dispute are the traditional common-law causes of action[18]—the same

---

[16] *See, e.g.*, *Alcorn*, 877 S.W.2d at 397; *Alanis v. Univ. of Tex. Health Sci. Ctr.*, 843 S.W.2d 779, 784–85 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Eiland v. Wolf*, 764 S.W.2d 827, 833 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

[17] *Cruzan v. Dir., Mo. Dep't. of Health*, 497 U.S. 261, 300–01, 110 S. Ct. 2841, 2863 (1990) (Scalia, J., concurring).

[18] *Cf. Daniels v. Williams*, 474 U.S. 327, 332, 106 S. Ct. 662, 665 (1986) ("Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); *Parratt*, 451 U.S. at 544, 101 S. Ct. at 1917

legal claims Villareal presumably would consider if a public school were not involved in this case. He already has alleged breach of contract. Based on the allegations that the first-year class was misled about the nature of the school's investigation and the conclusions to be drawn about whether the curve had been impacted, a tort claim such as fraudulent misrepresentation might provide a remedy,[19] subject to the application of defensive doctrines such as governmental and official immunities.[20]

To the extent the remedies supplied by the common law might be considered inadequate—because they are limited to money damages or could be barred by

---

(observing that the Fourteenth Amendment was not intended to function as "a font of tort law to be superimposed upon whatever systems may already be administered by the States," quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160 (1976)).

[19]   *See, e.g.*, *Ho v. Univ. of Tex. at Arlington*, 984 S.W.2d 672, 691 (Tex. App.—Amarillo 1998, pet. denied) (discussing fraudulent misrepresentation in context of dismissal of graduate student).

[20]   *See, e.g.*, *id.* at 683, 687–88 (discussing governmental and official immunity defenses to tort claims alleged in context of dismissal of graduate student). Notably, official immunity is conditioned on the individual defendant's "good faith" performance of discretionary duties within the scope of his authority. *See, e.g.*, *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). The objective standard for good faith inquires "whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *McCartney v. May*, 50 S.W.3d 599, 605 (Tex. App.—Amarillo 2001, no pet.) (quoting *Chambers*, 883 S.W.2d at 653).

13

immunity—the Legislature is better equipped to supply remedies to protect citizens' access to and fair treatment in the course of publicly funded graduate education. The Legislature can determine whether special statutes or regulations are necessary to supply legal rules to police and ensure fairness in academic exams. The Legislature can determine whether and to what extent the existing scope of immunity should be narrowed to allow students to access courts to vindicate their legal rights. And if the Legislature saw fit to take such actions, courts then would have justiciable standards by which the actions of professors and university administrators could be evaluated. Courts then would also have a basis grounded in law to determine whether a student was deprived of some right established by state law, and if so whether it was caused by some official action that conflicted with the due course of the law of the land.

## V

Confronted with a novel case like this, Texas judges should resist the easy path of merely stating that we follow the federal courts in their implementation of constitutional due-process protections. To the extent early Texas authorities reasonably observed a conceptual unity behind federal constitutional "due process" and state constitutional "due course of law,"[21] the ensuing 150 years of judicial

---

[21] *E.g.*, *Mellinger v. City of Houston*, 3 S.W. 249, 252–53 (Tex. 1887); *see also Patel*, 469 S.W.3d at 84.

experience have shown, at a minimum, that these important constitutional protections for individual rights have not always been susceptible to judicial implementation by objectively discerned standards. Citizens and jurists have disagreed in good faith about how these provisions can and should be enforced in the courts, and the solutions applied by the federal courts therefore are not necessarily the infallibly correct solutions.[22] These questions, including the means of safeguarding those unalienable rights of men that have not been reduced to writing in a constitutional text, ultimately depend on the application of reason and judgment, which federal and state courts are equally capable of performing, even when they reach different conclusions.

State courts interpreting their own state constitutions have an important role to play in ongoing national developments about the interpretation and application of American constitutional principles,[23] including the relative roles of the branches of government. Important perspectives will be lost and the quality of

---

[22] *Cf.* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 495 (1977).

[23] *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596–97 (2015) (discussing the role played by state courts, including decisions interpreting state constitutions, in helping to "explain and formulate the underlying principles" informing the U.S. Supreme Court's recognition of a constitutional right to same-sex marriage). Justice Kennedy's *Obergefell* opinion included two appendices listing state court decisions addressing or legalizing same-sex marriage. *See id.* at 2610–11.

decisionmaking will be poorer if we do not fully engage, and instead uncritically defer to federal precedents.

Texas courts do not have to meekly follow federal authorities when interpreting the Texas Constitution. We should adopt reasoning used in federal cases when it is relevant and persuasive. When federal authorities are relevant yet unpersuasive, we should engage in an independent judicial decisionmaking process and aim to reach better decisions and provide better guidance to the legal community and to the public generally, explaining the reasoning that we think better resolves the cases before us. In my view, our judicial oaths to preserve the Texas Constitution require nothing less.

\* \* \*

The briefing in this appeal and the novel issues presented to us assume the continuing validity of prior Texas decisions which have not analyzed the issues in the way I am suggesting. The briefs do not advocate any distinctive constitutional interpretations based on unique text or history associated with the Texas Constitution.[24] As such, in the current procedural posture the court is not equipped to draw any firm conclusions about what the Texas Constitution might require in a

---

[24] *Cf.* Sutton, *supra* note 3, at 177 ("There will never be a healthy 'discourse' between state and federal judges about the core guarantees in our American constitutions if the state judges merely take sides on the federal debates and federal authorities, as opposed to marshaling the distinct state texts and histories and drawing their own conclusions from them.").

case such as this. For present purposes at this early stage of litigation, I am satisfied with the court's conclusion that based on the current state of the law as stated by the Supreme Court of Texas and precedents of this court, it was error for the trial court to conclude that Villareal failed to plead viable constitutional claims. As such I concur in the court's judgment remanding the case for further proceedings in the trial court.

Michael Massengale
Justice

Panel consists of Justices Jennings, Higley, and Massengale.

Justice Massengale, concurring in the judgment.