# IN THE SUPREME COURT OF TEXAS

No. 19-0440

TEXAS SOUTHERN UNIVERSITY; DANNYE HOLLEY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; EDWARD MALDONADO (A/K/A SPEARIT), IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; GABRIEL AITSEBAOMO, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, PETITIONERS,

V.

IVAN VILLARREAL, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Argued December 1, 2020**

JUSTICE BUSBY delivered the opinion of the Court.

In this case, we address whether a state university's dismissal of a student for poor academic performance implicates a liberty or property interest protected by the Texas Constitution's guarantee of due course of law. Texas Southern University's Thurgood Marshall School of Law (the School) dismissed Ivan Villarreal after one year because he did not maintain the required 2.0 grade point average. Villarreal sued the School, alleging claims for breach of contract and deprivation of his liberty and property without due course of law. The School filed a plea to the jurisdiction invoking sovereign immunity, which the trial court granted. The First Court of Appeals reversed in part, holding that Villarreal had alleged viable procedural and substantive due course of law claims.

We hold that an academic dismissal from higher education carries insufficient stigma to implicate a protected liberty interest. And assuming without deciding that Villarreal had a protected property right in his continuing education, the procedures followed by the School in connection with his dismissal were constitutionally adequate. We therefore reverse the court of appeals' judgment with respect to Villarreal's constitutional claims and render judgment dismissing the case.

## BACKGROUND

Ivan Villarreal entered Thurgood Marshall School of Law in August 2014. He completed his first year with a 1.976 grade point average. The School's Student Rules and Regulations handbook includes a non-waivable requirement that a first-year student maintain an average of at least 2.0 to continue in the program. Villarreal was dismissed on June 10, 2015 for failing to meet this requirement.

Villarreal filed an untimely petition with the School's Academic Standards Committee that challenged his grade in criminal law based on irregularities in the administration of the School's uniform examination. He asked the committee to change his grade or readmit him immediately, waiving the two-year waiting period that would otherwise apply. Villarreal alleged that the School had mishandled a cheating investigation into reports that a professor held unauthorized review sessions in which some students received advance copies of certain exam questions. Villarreal did not attend the sessions, but he contended that cheating by others negatively affected his own grade. Before the committee could rule on Villarreal's first petition, he filed a second petition challenging all of his fall 2014 grades.

2

The committee reviewed Villarreal's first petition and denied it, explaining that the dean had already addressed the alleged cheating administratively. The dean's remedy gave each student the opportunity to challenge his or her criminal law grade individually by March 2015, which Villarreal did not do. The School had also implemented a class-wide remedy that gave students the higher of two test scores: the score they originally received and a score that disregarded answers to the allegedly compromised questions. Villarreal's score did not change under this remedy.

Villarreal was invited to meet with the committee and later with the dean regarding his second petition. Following those meetings, the petition was denied based on his unsatisfactory grades.

Villarreal then sued the School as well as the dean and other faculty members in their official and personal capacities, alleging that they mishandled the investigation into the alleged cheating incident and seeking declaratory and injunctive relief. He asserted a claim for breach of contract against the School, and he contended that the School and the faculty members violated his substantive and procedural rights under the due course of law clause of the Texas Constitution. The School and the individual defendants filed a plea to the jurisdiction that asserted sovereign immunity from suit and included evidence responding to some of Villarreal's allegations. The defendants contended that Villarreal lacked any constitutionally protected interest to support viable ultra vires claims under the due course of law clause and that Villareal's contract claim was barred by immunity. The trial court granted the plea to the jurisdiction in its entirety.

The First Court of Appeals reversed in part, holding that Villarreal alleged viable constitutional claims against the School and the individual defendants in their official capacities. *Villarreal v. Tex. S. Univ.*, 570 S.W.3d 916 (Tex. App.—Houston [1st Dist.] 2018). As a threshold

matter, the court concluded that Villarreal had a constitutionally protected liberty interest in his graduate education under this Court's holding in *University of Texas Medical School at Houston v. Than*, 901 S.W.2d 425, 429 (Tex. 1992). *See Villarreal*, 570 S.W.3d at 922.

Turning to whether Villarreal was unconstitutionally deprived of that interest, the court of appeals held that he had "adequately alleged a procedural due-course-of-law claim based on his allegation [regarding] the university's bad-faith mismanagement of an exam-grading controversy." *Id.* at 924. As to substantive due course of law, the court held sufficient his allegations "that the 'class-wide remedy' for irregularities in the criminal-law exam was arbitrary [and] implemented in bad faith." *Id.* at 925. The court therefore remanded the constitutional claims to the trial court for further proceedings. *Id.* at 925–26. Justice Massengale concurred in the judgment based on controlling precedent, but he questioned whether Texas courts should interpret our Constitution to protect a liberty interest in a student's reputation associated with the pursuit of graduate education. *Id.* at 926–29, 932 (Massengale, J., concurring). We granted the School's petition for review.

## ANALYSIS

As part of a state educational institution, the School and its employees acting in their official capacities have sovereign immunity from suit. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997); *see Franka v. Velasquez*, 332 S.W.3d 367, 383 (Tex. 2011). Whether sovereign immunity defeats a trial court's subject-matter jurisdiction is a question of law properly raised in a plea to the jurisdiction. *Tex. Nat. Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Thus, we review *de novo* whether a plaintiff has alleged or offered undisputed evidence of facts that establish jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). If disputed evidence creates a fact question regarding a

4

jurisdictional issue that also implicates the merits, however, a jury should resolve the dispute. *Id.* at 227–28.

Although there are factual disputes here regarding the School's cheating investigation, the parties agree on the facts relevant to our disposition of this case: Villarreal's grade point average was below a 2.0 at the conclusion of his first year; he filed multiple petitions seeking grade changes and reinstatement that were denied; and he was eligible to re-enroll after two years. We focus on these facts in determining whether, as a matter of law, Villarreal has alleged viable constitutional claims that overcome the School's sovereign immunity.

## I. Dismissal from higher education for academic reasons does not deprive a student of a protected liberty interest.

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. The due process clause of the Fourteenth Amendment to the United States Constitution uses similar language.[1] "Although not bound by federal due process jurisprudence . . . , we consider federal interpretations of procedural due process to be persuasive authority in applying our due course of law guarantee." *Than*, 901 S.W.2d at 929. For the most part, the parties do not ask us to take a different approach from the federal courts. We therefore consider not only Texas decisions but also federal decisions to inform our interpretation of the due course of law guarantee as it applies to dismissal from a state university.

To determine whether a governmental action violates the due course of law guarantee, we engage in a two-step inquiry. *Id.* First, does the plaintiff have a liberty, property, or other

---

[1] "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1.

enumerated interest that is entitled to protection?  *Id.*  Second, if a protected interest is implicated, did the government defendant follow due course of law in depriving the plaintiff of that interest? *Id.*

At the first step, the court of appeals asked whether Villarreal alleged a protected liberty interest in his graduate education and concluded that he had.  570 S.W.3d at 922.  This inquiry misunderstands the nature of the liberty analysis courts have employed in this area, which focuses on whether dismissal from a university interferes with the student's liberty interest in his or her reputation and employability, not on whether education is a protected liberty interest.

In deciding whether a dismissal from government employment or education amounts to the deprivation of a liberty interest under the due process clause of the U.S. Constitution, the U.S. Supreme Court looks to whether the dismissal imposes a stigma.  For example, the Court observed in *Wisconsin v. Constantineau* that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  400 U.S. 433, 437 (1971).  The Supreme Court later applied this principle to the dismissal of a non-tenured teacher at a state university.  In *Board of Regents of State Colleges v. Roth*, the Court concluded that

> [t]he State . . . did not make any charge against [the teacher] *that might seriously damage his standing* and associations in his community.  It did *not* base the nonrenewal of his contract on a charge, for example, that *he had been guilty of dishonesty, or immorality.*  Had it done so, this would be a different case.

408 U.S. 564, 573 (1972) (emphasis added).  Similarly, the State did not "impos[e] on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities."  *Id.*

6

Dismissals from educational institutions generally fall into two categories: disciplinary and academic. "Academic dismissals arise from a failure to attain a standard of excellence in studies whereas disciplinary dismissals arise from acts of misconduct." *Than*, 901 S.W.2d at 931 (citing *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86–87 (1977)). Courts frequently conclude that disciplinary suspensions and dismissals carry sufficient stigma to implicate a protected liberty interest. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 575 (1975) (concluding that suspension from public high school for disruptive or disobedient conduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment"); *Doe v. Miami Univ.*, 882 F.3d 579, 599–600 (6th Cir. 2018) (holding suspension of student for sexual misconduct impacted his reputation).

Whether an academic dismissal gives rise to sufficient stigma has received less attention, but the cases identify some relevant considerations. In *Horowitz*, the plaintiff was dismissed from medical school for academic deficiencies. 435 U.S. at 79–80. The Supreme Court placed some emphasis on evidence that the reasons for her dismissal were not publicly released, but it ultimately declined to decide whether she was deprived of a liberty interest. *Id.* at 83–84. Rather, it assumed the existence of a protected interest and concluded that the plaintiff had been afforded sufficient process. *Id.* at 84–85.

In *Roth*, the Court addressed a non-disciplinary decision not to rehire a higher education employee after the expiration of his contract, and it focused on the plaintiff's ability to continue in his chosen profession. 408 U.S. at 573–74. Concluding that the plaintiff held no constitutionally protected liberty interest in an expectation of future employment, the Court noted that he

7

"remain[ed] as free as before" to seek other employment. *Id.* at 575 (citing *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895–96 (1961)).

In *Than,* we used the Supreme Court's stigma framework to examine due course of law protection for a student dismissed from a state university. 901 S.W.2d at 929–30. We held that a dismissal for disciplinary reasons implicated a protected liberty interest under the Texas Constitution. *Id.* at 930. Citing *Roth*, we focused on the stigma associated with Than's dismissal and its impact on his future in the profession. *Id.* at 929–30. "A medical student charged with academic dishonesty faces not only serious damage to his reputation but also the loss of his chosen profession as a physician. The stigma is likely to follow the student and preclude him from completing his education at other institutions." *Id.* at 930 (citation omitted).

Applying the stigma framework here, we first consider whether Villarreal was dismissed for academic or disciplinary reasons. Villarreal argues that his suit does not challenge academic matters such as the required grade point average or whether his exam answers were correct.[2] Instead, he challenges the School's mishandling of its disciplinary response to the cheating allegations, which he says contributed to his low grade in criminal law and dismissal. But Villarreal was not involved in the alleged cheating, and he has not explained how any disciplinary stigma could attach to him as a result of the School's response. The School's choice of curative measures to mitigate the effect of the cheating on uninvolved students like Villarreal was academic in nature, and it is unclear how the School's response to the cheating caused Villarreal's dismissal

---

[2] Because Villarreal does not challenge the requirement of a 2.0 grade point average, his citation to *Foley v. Benedict*, 55 S.W.2d 805 (Tex. [Comm'n Op.] 1932) (orig. proceeding)—which upheld a similar requirement against an arbitrariness challenge—is not on point.

in any event.[3]  Villarreal was dismissed for failing to achieve the required 2.0 grade point average—a purely academic issue.

We must therefore determine whether a student's dismissal from a state university for inadequate academic performance carries sufficient stigma to impair a protected liberty interest under the Texas Constitution.  We conclude that unlike a disciplinary dismissal, the fact of dismissal for academic reasons does not "seriously damage" a student's reputation for honor or integrity.  *See Roth*, 408 U.S. at 573.  Nor does Villarreal allege that the School disclosed reasons underlying the dismissal or other information that would harm his good name.  *See Bishop v. Wood*, 426 U.S. 341, 348–49 (1976) (holding fact of police officer's dismissal from employment did not impact his reputation where reasons for discharge were not publicly disclosed).  In addition, Villarreal was free to apply for readmission to the School after two years or to seek admission to another law school.  To be sure, dismissal from an academic institution may create practical difficulties for a future academic or professional career.  But proof that an academic dismissal for poor performance made an individual somewhat less attractive to other institutions or employers would not demonstrate stigma.  *See Roth*, 408 U.S. at 574 n.13 ("Mere proof, for example, that his record . . . might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'").

---

[3] *See* 570 S.W.3d at 930 (Massengale, J., concurring) ("[S]uggestions that some conduct by [the School] could be proved to have proximately caused Villareal's academic dismissal, thereby depriving him of the opportunity to pursue a legal career, strain credulity.").

Finally, it is unclear what remedy a court could offer Villarreal. As we discuss further below, courts are ill equipped to evaluate the academic judgment of professors and universities.[4] *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985). Presumably Villarreal wants the School's response to the cheating scandal adjusted in some way, but he does not explain how. And we cannot see how additional discovery, which Villareal mentions in his brief, would provide clarity. For these reasons, we hold that Villarreal's allegations regarding his dismissal do not establish that the School deprived him of a liberty interest protected by the Texas Constitution's due course of law clause.

## II. Assuming Villarreal has a property interest in his continued education, he received procedural due course of law.

We next consider Villarreal's allegations regarding a protected property interest. Property interests are creatures of state common or statutory law. *See Horowitz*, 435 U.S. at 82. Villarreal contends that he has a property interest in his continued graduate education arising out of the School's Rules and Regulations and the money he paid the school in tuition. The court of appeals did not reach this issue.[5]

We need not decide whether Villarreal has a property interest protected by the due course of law clause of the Texas Constitution. Rather, we assume that he does for purposes of our

---

[4] Moreover, holding that Villarreal's dismissal implicated a liberty interest would open the floodgates for lawsuits challenging students' grades when they are suspended or dismissed for academic reasons, become ineligible for participation in NCAA athletics, or otherwise feel they have been treated unfairly.

[5] The School argues that Villarreal waived his claim of a property right by failing to raise it in his response to the petition for review. We disagree. As we explained in *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, a party may suggest that we consider issues briefed in the court of appeals but not decided by that court by raising them in the petition, the response, the reply, any brief, or a motion for rehearing. 297 S.W.3d 768, 774 n.5 (Tex. 2009) (citing TEX. R. APP. P. 53.4). Because Villarreal raised the issue in his merits brief, it is not waived.

analysis. *See, e.g.*, *Ewing*, 474 U.S. at 225. As noted above, if a protected interest is implicated, the second question is whether the defendant followed due course of law in depriving the plaintiff of that interest. This inquiry may have both procedural and substantive aspects, but we conclude that only a procedural analysis is needed here.

Regarding procedural due course of law, we conclude that Villarreal received at least as much process as the Constitution required in connection with his dismissal. Whether a dismissal is disciplinary or academic affects the amount of process due. "In *Goss*, th[e] Court felt that suspensions of students for disciplinary reasons have a sufficient resemblance to traditional judicial and administrative factfinding to call for a 'hearing' before the relevant school authority." *Horowitz,* 435 U.S. at 88. But a formal disciplinary hearing is not required. "*Goss* required . . . an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Id*. at 86 (quoting *Goss*, 419 U.S. at 581).

With respect to academic dismissals like Villarreal's, the Court "decline[d] to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship." *Id.* at 90. Indeed, it recognized "that a hearing may be . . . harmful in finding out the truth as to scholarship." *Id.* (cleaned up). Additionally, "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement." *Id*. at 89. The Court went on to observe that "the decision of an individual professor as to the proper grade for a student in his course, [like] the determination whether to dismiss a student for academic reasons[,] requires an expert evaluation

11

of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90. Simply put, judicial scrutiny would place the courts in the role of evaluating students and intrude upon an essential function of faculty members. As a result, "dismissals for academic (as opposed to disciplinary) cause do not necessitate a hearing before the school's decisionmaking body." *Id*. at 87.

Here, Villarreal undisputedly had notice that the School's Rules and Regulations required him to maintain a 2.0 grade point average to continue. And he was given multiple opportunities to appeal his grade and, ultimately, his dismissal. The dean advised students of the opportunity to contest their criminal law grades individually. Villarreal failed to do so. He proceeded to file multiple, admittedly late petitions with the Academic Standards Committee. The committee reviewed and denied his first petition. Villarreal then met with the committee and the dean after filing his second petition, which was later denied. And he was afforded the opportunity to re-enroll after a two-year waiting period. We conclude as a matter of law, therefore, that Villarreal received adequate procedural due course of law in connection with his dismissal.

Turning to substantive due course of law, Villarreal contends that the Student Rules and Regulations and the money he spent on tuition confer a property right to continued graduate education that the Texas Constitution protects against arbitrary or capricious deprivation. Because our Constitution does not recognize higher education as a fundamental right, however, Villarreal's alleged property right does not fall within any substantive protection provided by the due course of law clause.

In his *Ewing* concurrence, Justice Powell explained the limited nature of federal substantive due process protections for state-law property rights. "[N]ot every [property] right is entitled to

12

the protection of substantive due process.  While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution," and "[t]he history of substantive due process counsels caution and restraint" in recognizing such rights.  *Ewing*, 474 U.S. at 229 (Powell, J., concurring) (cleaned up).  In particular, "a state-law contract right . . . bears little resemblance to the fundamental [liberty] interests" the U.S. Supreme Court has "viewed as implicitly protected" by the federal due process clause.  *Id.* at 229–30; *see Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (explaining that federal substantive due process "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed" (cleaned up)).

We need not address today the extent to which the Texas Constitution's due course of law clause may provide similar substantive protection for fundamental rights because we have held that higher education is not such a right.  Unlike the U.S. Constitution, our Texas Constitution is quite lengthy and frequently amended.[6]  When Texans want to provide substantive constitutional protection for educational rights, they are not shy about saying so expressly.  For example, Article VII section 1 imposes on the Legislature "the duty . . . to establish and make suitable provision for

---

[6] There are many similarities between the U.S. and Texas Constitutions: for example, both have bills of rights and establish a three-branch government, including a bicameral legislature.  But these two governing documents are also very different.  The U.S. Constitution has a mere 4,543 words and has been amended only twenty-seven times since 1789.  Amendments may be proposed by a two-thirds vote of both houses of Congress or a national convention called by Congress at the request of two-thirds of state legislatures.  But amendments become valid only when ratified by the legislatures of, or conventions in, three-fourths of the states.  U.S. CONST. art. V.  In contrast, the Texas Constitution contains approximately 86,000 words and has been amended nearly 500 times since 1876.  Amendments may be proposed by a two-thirds vote of the full membership of both houses of the Legislature, and they are ratified by a simple majority of votes in a statewide election.  TEX. CONST. art. XVII, § 1.

the support and maintenance of an efficient system of public free schools." TEX. CONST. art. VII, § 1. But in *Richards v. League of United Latin American Citizens*, we rejected the argument that this provision made "higher education . . . a fundamental right secured by the Texas Constitution." 868 S.W.2d 306, 315 (Tex. 1993).

If the people of Texas want a fundamental right to higher education, they can create one by amending our Constitution. It is not our role as judges to adopt such a right for them. As a matter of Texas constitutional law, therefore, we decline to recognize substantive protections for educational rights that emanate implicitly from the due course of law clause.

For these reasons, we conclude that Villarreal is not entitled to substantive due course of law protection for any property right in his continued education, and that he received the procedural protections due in connection with his dismissal. Therefore, Villarreal's allegations do not establish that the School deprived him of a protected property interest without due course of law.

### CONCLUSION

Dismissal from a state university for academic reasons does not carry such a stigma or limit an individual's ability to pursue a profession to such a degree that it implicates a constitutionally protected liberty interest. And assuming without deciding that Texas law would recognize Villarreal's alleged property right in continued education, a hearing is not necessary. Notification of the reason for dismissal and the ability to respond are sufficient, and it is undisputed that Villarreal had those opportunities here. Thus, Villareal has failed to overcome the sovereign immunity of the School and its employees acting in their official capacities. We reverse the court of appeals' judgment with respect to Villarreal's claims under the Texas Constitution and render judgment dismissing the case.

14

_____
J. Brett Busby
Justice

**OPINION DELIVERED:**  April 16, 2021